SYKES, Circuit Judge,
dissenting.
An employer is covered by the Railroad Retirement and Unemployment Insurance Acts (and therefore required to contribute to these federal funds) if it is a “carrier by railroad subject to the jurisdiction of the Surface Transportation Board.” 45 U.S.C. § 231(a)(1)® (Railroad Retirement Act); 45 U.S.C. § 351(b) (Railroad Unemployment Insurance Act). The Transportation Board’s jurisdiction is limited to “transportation by rail carrier that is ... by railroad [operating interstate ].” 49 U.S.C. § 10501(a) (Transportation Board has jurisdiction over transportation by rail carrier that is “in the United States” and “part of the interstate rail network” or between a place in one state and a place in another state, U.S. territory, or foreign country). A “rail carrier,” in turn, is defined as a “person providing common carrier railroad transportation for compensation.” Id. § 10102(5). “Common carrier” is not defined, but as my colleagues have noted, the Transportation Board and the courts have used the common-law definition: an entity that “holds itself out to the general public as engaged in the business of transporting persons or property from place to place for compensation.” Am. Orient Express Ry. Co., S.T.B. Fin. Docket No. 34502, at 4 (served Dec. 29, 2005), 2005 WL 3552968; Am. Orient Express Ry. Co. v. Surface Transp. Bd., 484 F.3d 554, 557 (D.C.Cir.2007) (affirming the Transportation Board’s use of this definition).
Putting these elements together, to be covered by the Acts, an employer must provide interstate common-carrier transportation by rail. More specifically, the employer must hold itself out to the public as offering interstate passenger or freight rail transportation for a tariff. See Majority Op. at 473 (giving “common carrier” its common-law meaning: “an entity that holds itself out to the public as offering transportation services to all who are willing to pay its tariff’).
Petitioners Dallas Area Rapid Transit (“DART”) and Fort Worth Transportation Authority (“the T”) are regional public-transportation authorities and political subdivisions of the State of Texas.[1] Since 1999 they have jointly owned a line of train track that runs between the cities of Dallas and Forth Worth. The cities previously owned the line, having acquired it in 1984 from the Trustee in bankruptcy for the Chicago, Rock Island and Pacific Railroad Company. See City of Dallas, City of Fort Worth & D/FW RAILTRAN, I.C.C. Fin. *479 Docket No. 32406 (served Dec. 30, 1993), 1993 WL 540395 (“RAILTRAN”). DART provides commuter rail service on the subject line marketed under the brand name “Trinity Railway Express.” Herzog Transit Services, Inc., operates this service under a contract with DART. The line of track and the commuter rail service operating on it are entirely intrastate, running only between Dallas and Fort Worth.
Four interstate freight railroads also use this line of track pursuant to preexisting easements and related agreements that have been modified over time as the ownership of the line has transferred to Dallas and Fort Worth and then to DART. In 2001 DART expanded Herzog’s contract operating responsibilities to include maintenance of the track and dispatching of all train traffic. In response to this move, and based on an inquiry from a Herzog employee, the Railroad Retirement Board opened a proceeding for an “employer status determination.” In a split decision, the Board held that Herzog is a covered employer under the Acts with respect to its employees who perform dispatching services. Errvp’r Status Determination — Dec. on Recons., Trinity Ry. Express — Train Dispatching, Herzog Transit Servs., Inc., B.C.D. 09-53 (served Oct. 28, 2009), available at http://www.rrb.gov/blaw/bcd/bcd0953.asp (last visited Oct. 12, 2010).
As my colleagues have noted, the Board’s rationale was that because “[despatching service is an indispensable component of carrier service and must be delivered as a part of carrier service,” dispatching operations are covered by the Acts. Id. at 4. The Board further held that “[wjhere, as in this case, the train dispatching includes trains that operate interstate, the entity dispatching trains operates as a rail carrier within the meaning of the definition of an employer under the Railroad Retirement and Railroad Unemployment Insurance Acts.” Id.
DART, the T, and Herzog jointly petitioned this court for review. In a scholarly opinion, my colleagues have outlined the applicable statutes and regulations and provided a thorough explanation of the historical background of the Acts. In my view this should lead us to reject the Board’s decision. But my colleagues accept it and therefore deny the petition for review. I disagree. The Board’s decision ignores the statutory requirements for covered-employer status under the Acts and conflicts with the Interstate Commerce Commission’s (“ICC”) decision in RAILTRAN, which addressed the common-carrier status of the predecessor operator of this very same Dallas-Fort Worth commuter rail line under similar circumstances as those presented here.
Like the Board, my colleagues rest their decision on the fact that dispatching is “a necessary and integral part” of interstate rail transportation. Majority Op. at 474. It goes without saying that a train' — ■ whether running wholly intrastate or interstate — does not move without an order from a dispatcher. But it does not follow that dispatching alone is enough to trigger covered-employer status under the Acts. Under the interlocking definitions in the statutory scheme, covered-employer status is limited to interstate “common carriers” by rail — that is, to entities that hold themselves out to the public as providers of interstate rail transportation for passengers or freight. Providers of subsidiary services that make interstate rail transportation possible are not themselves “interstate common carriers.”[2]
*480 It makes no difference to the common-carrier analysis that DART “t[oo]k back one aspect of the right to run interstate rail operations over its lines — dispatching — and vest[ed] that right in Herzog Transit.” Id. This analysis misconstrues the contractual arrangements among and between the parties. As the owner of the line, DART had the right to dispatch trains on the track. It could perform this function itself or contractually designate another to do it — one of the freight railroads, perhaps, or Herzog or another contractor. But it is not correct to suggest that by designating Herzog to do the dispatching, DART effectively “took back one aspect of the right to run interstate rail operations over its lines” and vested it in Herzog. Id. The interstate freight railroads had preexisting rights, via easement or other contracts, to run their trains on this track. DART did not “take back” these rights from them. DART owns the line but never owned interstate freight rights (or interstate passenger rights, for that matter) and never assumed responsibility for interstate rail service.
To the contrary, DART owns and through its contract partner (Herzog) operates a wholly intrastate commuter line. As such, neither DART nor Herzog is an interstate common carrier. If DART was dispatching the trains itself, it would not, by virtue of that function alone, become an interstate common carrier. That it assigned the dispatching function to Herzog does not make Herzog an interstate common carrier, either.
This was essentially the holding in RAILTRAN, a 1993 decision by the ICC (the predecessor to the Transportation Board) in a case involving the cities of Dallas and Forth Worth and this very same commuter rail line. The cities had formed RAILTRAN to manage and operate the line for commuter rail service and were in the process of restructuring their contractual arrangements with the interstate freight carriers that also used the corridor. They sought a declaratory order from the ICC on the question whether RAILTRAN or the cities would become common carriers (and therefore covered employers under the Acts) if they assumed certain functions — including dispatching— necessary to operate the line. The ICC held that the proposed agreements would not trigger its jurisdiction; the agreements, the agency held, “will not change the non-carrier status” of RAILTRAN or the cities. RAILTRAN, I.C.C. Fin. Docket No. 32406, 1993 WL 540395, at *4. The agreements “would permit [the cities or RAILTRAN] to select a Designee to perform certain contract duties such as maintenance, dispatching and operational control” of the line, “[b]ut ... that authority would not change their relationship to the line.” Id. The ICC concluded that the cities and RAILTRAN “will not become common carriers under the Act by executing or carrying out [the proposed agree *481 ments], or by contracting for an Operator to provide rail commuter service or Designee to dispatch and/or maintain the. Corridor for joint use.” Id. at *5. The ICC further concluded that its authorization was not required (that is, its jurisdiction would not be triggered) if RAILTRAN were to “dispatch or maintain the Corridor [itself] or to select a Designee other than [one of the interstate freight carriers] to perform this function.” Id.
RAILTRAN, it seems to me, is directly on point. Its holding, as applied here, means that DART’s assignment of the dispatching function to Herzog does not make either DART or Herzog an interstate common carrier subject to the Transportation Board’s jurisdiction. It is true that the petitioners did not alert the Board to the RAILTRAN decision during the agency proceedings. But the Board has not relied on waiver doctrine and instead has devoted considerable space in its appellate brief to discussing this case. Despite its length, however, the Board’s discussion of RAIL-TRAN has not persuasively distinguished it.
Because the Board’s decision fails to apply the statutory standards for covered-employer status under the Acts and conflicts with the ICC’s decision in RAIL-TRAN; I would grant the petition for review and reverse. Accordingly, I respectfully dissent.

. For ease of reference, I refer to DART and the T collectively as "DART,” unless the context requires otherwise.

. There may be an exception for entities that have the power to "materially interfere” with the operations of a common carrier. The Transportation Board has strongly implied *480 that a noncarrier with the power to “materially interfere” with the operations of a common carrier is itself subject to the jurisdiction of the Transportation Board. See Metro-N. Commuter R.R. Co., S.T.B. Fin. Docket No. 34293, at 3 (served May 13, 2003), 2003 WL 21062876; see also Md. Transit Admin., S.T.B. Fin. Docket No. 34975 (served Oct. 9, 2007), 2007 WL 2936134. However, the "materially interfere” inquiry is practical, not abstract, and looks to whether the noncarrier is actually in a position to exert meaningful negative influence over a common carrier's operations. Here, DART’s agreement with Herzog significantly limited Herzog’s dispatching discretion by subjecting it to the General Code of Operating Rules and establishing strict priority rules for trains running on the subject line. J.A. at 266. Herzog is therefore not in a position to materially interfere with the operations of a common carrier and is not subject to the jurisdiction of the Transportation Board under this alternative theory.